# Federal Defenders
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

August 25, 2021

BY ECF

The Hon. Joan M. Azrack
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:     *United States v. Osei Montrose*, No. 18 Cr. 316 (JMA)

Your Honor:

This office represents Osei Montrose, an SOS participant.  I write in connection with Mr. Montrose's sentencing, which is currently scheduled for September 10, 2021, at 1:00 p.m.

On March 23, 2021, Mr. Montrose pled guilty to one count of importation of cocaine, *see* 21 U.S.C. § 952(a), and one count of possession of at least 500 grams of cocaine with the intent to distribute it further, *see* 21 U.S.C. § 841(a)(1) & (b)(1)(B)(ii)(II).

## I.     PRELIMINARY STATEMENT

I respectfully urge the Court to impose a non-Guidelines sentence of time served.  Such a term would be in line with standard courier sentences in this District, even leaving aside Mr. Montrose's demonstrated progress during his time in SOS.

As this Court is aware, Mr. Montrose entered the program homeless, estranged from his family, having never had a job, and with markedly low-functioning cognitive, social, and behavioral skills.  From that baseline, and despite the economic disruption of the pandemic, he now rents a room of his own, is earning a steady wage from DoorDash deliveries, completed substantial job training, worked toward his TASC exam, engaged with therapy, and earned the support of his family.  To be sure, Mr. Montrose's occasional impulsivity has led to curfew and marijuana violations—which is why, unlike many SOS participants, he has pleaded guilty to a felony offense and is now to be sentenced—but he has not engaged in any proven criminal conduct; the state cases against him remain pending, and we expect them to be resolved in his favor.  Accordingly, no statutory sentencing factor warrants further incarceration.

The Court should decline the PSR's invitation to increase Mr. Montrose's advisory Guidelines range in three legally erroneous respects.  First, there is no competent proof of what

amount of drugs (if any) was involved in Mr. Montrose's prior trips—the PSR's proposed additional drug amount is based upon nothing more than speculation. Second, it would be reversible error to deny Mr. Montrose acceptance points due to allegations in unproven, pending state court cases.

Finally, and most troublingly for future SOS cases, the PSR seeks extra punishment because Probation believes that Mr. Montrose's "post-offense rehabilitative efforts in the SOS Program has [sic] been marginal at best." (PSR ¶ 10). Leaving aside the point that this is factually incorrect, it is also not a lawful, or even rational, basis for additional jail time. If SOS participants faced punishment for failing to live up to some undefined standard of rehabilitation (especially where progress can be demonstrated, as here, by clear objective metrics) what defendant would ever agree to participate in the first place? SOS is an opportunity, not a trap.

Attached for the Court's consideration are letters of support from Mr. Montrose's mother and brother. We ask the Court to impose a sentence of time served.

## I.   BACKGROUND

### A.   Mr. Montrose's Challenges Before SOS Supervision

Osei Montrose immigrated to the United States from Guyana in 2006, when he was ten years old. (PSR ¶¶ 38, 41). Adjusting to this country was a struggle. Mr. Montrose has a low-functioning cognitive profile. He had to repeat fifth grade, and despite special education classes "he ultimately dropped out" of school "due to his learning difficulties." (PSR ¶¶ 57-58). Mr. Montrose has never passed the educational level of a fourth-grader in most subjects. (PSR ¶ 58).

Mr. Montrose was adrift after leaving school. "[U]nemployed and supported financially by his mother" (PSR ¶ 69), he fell in with the wrong crowd. Despite his mother's efforts, he had no structure to contain his impulsivity. Mr. Montrose began smoking marijuana (PSR ¶ 56), and "was influenced by others" to commit the instant offense (PSR ¶ 39).

By that point, Mr. Montrose's behavior had estranged him from his family. His formal address was still his mother's residence, but he was there only rarely and was otherwise homeless. In fact, his mother "was initially reluctant to cosign a bond for [his] release" in this case; the family only did so after being assured of the supervision and structure Mr. Montrose would be afforded in the SOS Program. (SOS Status Report, Sept. 2018, at 1).

Mr. Montrose entered the SOS Program having never had a job. (*See id.*). Indeed, "he did not even know how to apply for a job, or how to behave during an interview." (*Id.*). He had no vocational training or further education. He failed to grasp even the basic concepts necessary for making a personal budget. (*See* SOS Status Report, Nov. 2018, at 1). And he never had counseling or support for his cognitive and mental health challenges.

### B.   Mr. Montrose's Progress In The SOS Program

1.   In the first few months of SOS, Mr. Montrose had some false starts. His cognitive profile and learning difficulties caused him to be distracted and disruptive during his

2

first classes at the HOPE Program, and he was soon terminated from that program. (SOS Status Report Sept. 2018). But Mr. Montrose got his act together and applied to the CEO employment program (*see id.*), where he at last began to find his way, improving his interviewing skills and gaining specific construction and OSHA training (*see* SOS Status Report Oct. 2018).

With these skills under his belt, Mr. Montrose went on to secure the first jobs he has ever had. In the past three years, has worked as a seasonal worker at UPS (SOS Status Report Nov. 2018), a contractee delivery worker for Fresh Direct (SOS Status Report May 2019), a warehouse worker (SOS Status Report, Feb. 2020), a delivery person for Dutch Express (SOS Status Report, June 2020), and, most recently, a delivery person for DoorDash (SOS Status Report, July 2021), each time taking the initiative to find and obtain the next job when the previous became unavailable.

2.      Mr. Montrose has also obtained housing for himself, an immense step forward for someone who had previously been homeless for years. Mr. Montrose initially lived with his family following his release from custody, but, in light of the tensions he had caused in that relationship, that was not a permanent solution.

Unfortunately, Mr. Montrose subsequently moved in with his now-ex-wife, Denise Houlton. (PSR ¶ 42). That was a mistake. Ms. Houlton is a profoundly unstable person who repeatedly reached out to me, Officer Adossa-Ali, and the police, making a number of outlandish claims about Mr. Montrose and threatening to blackmail him in an overt, admitted attempt to force him to commit to their relationship.

It was therefore a turning point for Mr. Montrose when the Court directed him to move out of Ms. Houlton's home. He went on to live in a series of shelters until he finally obtained a voucher to secure permanent subsidized housing. He now lives in his own room in a boarding house Bronx. (*See* SOS Status Report, July 2021).

Critically, Mr. Montrose also showed the good judgment to sever all ties from Ms. Houlton. All that remains is a pending domestic assault allegation by her, a matter in which Mr. Montrose has counter-complained. (*See* PSR ¶ 30 & Add.). The defense expects that matter will be dismissed or otherwise resolved in Mr. Montrose's favor.

3.      Mr. Montrose has, in addition, begun the difficult process of addressing his impulsivity and irrational behaviors in therapy. The PSR characterizes his progress in this regard as "marginal to date" (PSR ¶ 51), but that is unfair. Mr. Montrose's therapist has taken note of areas where Mr. Montrose has achieved real insight. For example, following his split with Ms. Houlton, he admitted missing her, but "finally identified the relationship as toxic." (SOS Status Reports, Oct. 2020).

Furthermore, in times of "chaos in his life," Mr. Montrose's therapist notes that he has come to reach out for help "when he feels he is in a critical state." (SOS Status Report, June 2020). This, too, is a sign of progress. The therapist has written that Mr. Montrose "is using sessions to talk about internal struggles . . . but he is staying positive. I am confident that he is

staying on the right path and being more true to things that are beneficial to his progression in treatment." (*Id.*).

4. The PSR defends its characterization of Mr. Montrose's treatment progress as "marginal" by noting his "new arrests." (PSR ¶ 51). But that too is unfair. Those cases all remain pending and unproven, and it is inappropriate (not to mention unlawful, as discussed below) to penalize Mr. Montrose for them. (*See* PSR ¶¶ 2, 10 & Add.). Mr. Montrose, it should be noted, has no previous convictions. (PSR ¶¶ 26-27).

It is particularly inappropriate for Probation to credit Ms. Houlton's account of the domestic incident, in light of her outlandish and overtly coercive behavior to defense counsel and Pretrial. As for the assault charge, even as alleged it says that Mr. Montrose responded to an assault on his own person by declining to engage in counter-assault, but instead taking his anger out with property destruction. No one believes that conduct deserves a medal, but the point is that it shows a measure of restraint and control over what used to be rampant impulsivity.

We acknowledge that Mr. Montrose has had his share of violations while on Pretrial release. He has had difficulty being compliant with curfew, he has had two instances of marijuana use (each more than two years ago), and he has sometimes not been forthcoming to Pretrial about difficult matters like Ms. Houlton. That is why we have determined that Mr. Montrose should accept a felony conviction in this matter, and forgo his opportunity for a more favorable resolution. But those mis-steps do not erase the very real, objective progress Mr. Montrose has also made on supervision, particularly when compared to where he was before he started the program.

5. Perhaps the clearest proof of Mr. Montrose's progress comes from the people who know him best: his family. As discussed above, Mr. Montrose was estranged from his mother when he was arrested in this case. She was initially reluctant to even sign his bond. Now, after three years in the SOS Program, Mr. Montrose has repaired their relationship.

They are now proactively supportive when Mr. Montrose needs their help. Understandably, he is feeling disappointed in his case outcome and worried about this Court's sentence. His family has responded by trying "[t]o assist him with engagement in more prosocial activities" and "trying to socially engage together more often." (SOS Update, June 2021). Indeed, Mr. Montrose's travel restrictions were recently expanded so that he can visit his family in New Jersey. (*Id.*).

## II. APPLICABLE SENTENCING LAW

### A. The Statutory Sentencing Factors

A sentencing court is required to consider the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence in each individual case. *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Section 3553(a) directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)," which in turn sets forth that the applicable purposes are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To arrive at such a sentence, the Court is further directed to consider these additional factors set forth in Section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established in the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution. In every case, the sentencing court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

**B.      The Disputed Base Offense Level And Agreed-Upon Reductions**

The defense agrees with the government's estimated base offense level of 24, which is based solely on the amount of drugs obtained from Mr. Montrose at his arrest in this case. *See* U.S.S.G. §§ 2D1.1(a)(5) & (c)(8); (Gov't Plea Penalty Sheet). The PSR proposes a higher offense level of 26, based upon "an additional 2 kilograms" of cocaine, which amount is allegedly "comprised of a half-kilogram [Mr. Montrose] transported on each of the four prior courier trips." (PSR ¶ 5; *see also* PSR ¶ 12). This is erroneous. I gather the government, pursuant to its standard practice, will not seek to prove additional drug weight based upon Mr. Montrose's uncounseled statements to law enforcement about his previous drug trips. That practice is sound, because Mr. Montrose's own estimated belief that he had previously smuggled half a kilogram of material on each trip is insufficient to prove that there was a controlled substance in that material weighing a half-kilogram, let alone that the substance was cocaine.

The defense agrees with the PSR that Mr. Montrose's plea, lack of any criminal history, and full confession to law enforcement at arrest satisfy the safety valve requirements (*see* PSR ¶ 13; U.S.S.G. § 5C1.2(a)), warranting a sentence below the mandatory minimum and a two-point reduction in the offense level (*see* U.S.S.G. § 2D1.1(b)(18)). We also agree that the further four-point minimal participant reduction is warranted, as is standard in courier cases. (*See* PSR ¶ 15); U.S.S.G. 3B1.2(a).

**C.      The Disputed Reduction For Acceptance Of Responsibility**

The defense objects to Probation's unprecedented suggestion that Mr. Montrose be denied an acceptance of responsibility reduction because "the defendant has continued to engage in criminal activities while on bond," including "an alleged violent assault;" he failed two drug

tests more than two years ago; and "his post-offense rehabilitative efforts in the SOS Program has [sic] been marginal at best." (PSR ¶ 10). None of these is a lawful basis to deny acceptance points.

As an initial matter, it is undisputed, as discussed above, that Mr. Montrose's post-arrest statements satisfy the safety-valve provisions. That and his plea of guilty "constitute significant evidence of acceptance of responsibility." U.S.S.G. § 3E1.1 app. n.3. Indeed, the PSR *itself* recognizes that, "[b]ased on the defendant's plea . . . a reduction for acceptance of responsibility is warranted." (PSR ¶ 9). None of the PSR's proffered reasons for denying acceptance outweigh this "significant evidence," because they are not "conduct of the defendant that is inconsistent with acceptance of such responsibility." U.S.S.G. § 3E1.1 app. n.3.

First, the PSR incorrectly assumes Mr. Montrose's alleged "criminal activities" have been admitted or proven—the PSR claims outright that he "did not withdraw from criminal conduct following his arrest." (PSR ¶ 10). But that is not so. Each of the three cases remain pending, and no conviction has been entered. It would be reversible error to increase Mr. Montrose's sentence based on unproven arrests, including the "alleged violent assault." *See, e.g.*, *Williams v. United States*, 112 S. Ct. 1112, 1119 (1992) (use of prior arrest record insufficient to support upward departure); *United States v. Santos Castillo-Torres*, No. 21-1243, -- F.3d --, -- (1st Cir. Aug. 11, 2021), slip op. at 3 (reversing sentencing court's reliance upon unproven "allegations in a [state] criminal complaint to find that [defendant] had previously used a weapon to cut another person").

Second, failing two drug tests for marijuana more than two years prior to sentencing has never in this District, to this Office's knowledge, constituted "criminal conduct" that could outweigh a defendant's clear acceptance of responsibility for the offense. For good reason. Personal, occasional marijuana use, now ceased, is totally irrelevant to the instant offense, and such conduct is made even more marginal because many jurisdictions, including the State of New York, do not consider marijuana use to be criminal.

Third, that Probation views Mr. Montrose's efforts in the SOS Program as "marginal" is both mistaken and irrelevant. By any objective measure, as discussed above, Mr. Montrose has made significant achievements, particularly considering his baseline, in housing, employment, mental health, and family support. And even if it were not mistaken, Probation's own subjective opinion of Mr. Montrose's rehabilitation cannot warrant a Guidelines increase. If a citizen of this country is to be stripped of his liberty, it is this Court's assessment of Mr. Montrose's objective, proven conduct that counts, not Probation's subjective opinion. Finally, if SOS participants are really to be penalized with more jail time whenever their rehabilitation is assessed by Probation as merely "marginal," that will cause potentially insurmountable problems for our ability to counsel future clients about the program. SOS is an opportunity, not a trap.

D.     **The Resulting Advisory Guidelines Range**

Starting from the parties' stipulated base offense level of 24, accepting the PSR's four-point minimal participant reduction and the further two-point safety-valve reduction, and factoring in, as the defense proposes, the full three-point reduction for timely acceptance, the

total offense level is 15. In light of Mr. Montrose's lack of criminal history, his advisory Guidelines range is 18-24 months.

However, as discussed above, the Guidelines range is just one of several factors set forth in Section 3553(a) that a district court must consider when imposing sentence. *See supra*; *see also Pepper v. United States*, 562 U.S. 476, 490 (2011). A sentencing court "has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'" *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted).

## III. ARGUMENT

A non-Guidelines sentence of time served is sufficient, but not greater than necessary, to comport with the purposes of sentencing in Mr. Montrose's particular case.

Such a sentence would be in line with standard, comparable courier sentences imposed in this District. *See, e.g., United States v. Juan Arias Nataniel*, No. 15-CR-588 (MKB) (time served of 10 days); *United States v. Manuel Gomez*, No. 17 Cr. 396 (MKB) (time served of two weeks); *United States v. Shanita Willis*, No. 14 Cr. 573 (ARR) (probation); *United States v. Chevelle Nesbeth*, No. 15 Cr. 18 (FB) (probation); *United States v. Vinas*, 16 Cr. 43 (FB) (time served of one day); *United States v. Segunda De La Rosa*, No. 15 Cr. 234 (RJD) (same); *United States v. Kemar Elliott*, No. 14 Cr. 574 (SJ) (same); *United States v. Bobadilla*, 16 Cr. 491 (SJ) (time served of 3 days); *United States v. Tamera Keeney*, No. 15 Cr. 66 (SJ) (probation); *United States v. Allyssa Peters*, No. 15 Cr. 416 (ERK) (time served of one month); *United States v. Khalila Gunter*, No. 15 Cr. 172 (SLT) (time served of four days); *United States v. Monique Johnson*, No. 15 Cr. 534 (WFK) (time served of one day); *United States v. Ramkisson*, 17 Cr. 680 (AMD) (time served of 10 days); *United States v. Dennis*, No. 18 Cr. 145 (JBW) (time served of one day); *United States v. Hendricks*, No. 17 Cr. 648 (RRM) (time served of one day); *United States v. Lewis*, No. 16 Cr. 156 (RRM) (same); *United States v. Macias*, No. 17 Cr. 62 (DLI) (probation).

Courts' regular downward variances in this category of cases reflect a common problem with the applicable advisory Guidelines range: the range substantially overstates the nature of the offense. The applicable range in all such cases is principally driven by the weight of the drugs that were transported. But that calculus is "not based on empirical data, Commission expertise, or the actual culpability of defendants. . . . Instead, [the Guidelines] are driven by drug type and quantity, which are poor proxies for culpability." *United States v. Diaz*, No. 11-CR-00821-2 JG, 2013 WL 322243, at *1 (E.D.N.Y. Jan. 28, 2013).

This flaw came about because the Sentencing Commission linked "the Guidelines ranges for *all* drug trafficking defendants to the onerous mandatory minimum penalties in the Anti–Drug Abuse Act of 1986 . . . that were expressly intended for only a few," *i.e.*, the leaders and managers of drug trafficking crimes. *Id.* Nor do the minimal role adjustments afforded to couriers like Mr. Montrose fix the problem. Rather, "they nibble around the edges of a sentencing framework myopically focused on drug weight and unreasonably moored to mandatory minimums intended for high-level drug traffickers." *Id.* at *7.

A time served term would therefore properly reflect the nature of the offense and avoid unwarranted sentencing disparities. Mr. Montrose was not a leader or a manager of the trafficking scheme that led to this offense. He was a courier, and the weight of the drugs he carried was chosen for him. Yet his base offense level treats him equally to the people above him in the trafficking organization, who bear significantly more culpability than he does. For this reason alone, the Guidelines range—whether or not the Court adopts the objections discussed above—should be disregarded as a significant factor in his sentence.

Moreover, Mr. Montrose's history and characteristics present no reason for a further term of incarceration. As discussed above, he has made demonstrated progress over the past three years in securing stable housing; obtaining job skills that have led to the first employment of his life, even during the economic disruption of the pandemic; engaging with mental-health treatment; and reconnecting to his family support system. This progress is all the more laudable given the substantial obstacles Mr. Montrose faced before arrest: homeless, never employed, and with a low-functioning cognitive profile operating at a fourth-grade level. As discussed above, Mr. Montrose's mis-steps on supervision have led to his felony conviction here; they do not remotely warrant a term of incarceration.

For the same reasons, recidivism is not a concern. Mr. Montrose's own steps at rehabilitation have been substantial, and as a general matter "the United States Sentencing Commission concluded in a recent study there is 'little apparent association between the length of imprisonment and recidivism for drug trafficking offenders,'" particularly first-time offenders. *United States v. Johnson*, No. 16-CR-593, 2017 WL 1157186, at *1, *4 (E.D.N.Y. Mar. 28, 2017) (quoting Recidivism Among Federal Drug Offenders at 3) (sentencing courier defendant to time served).

We ask that the Court impose a sentence of time served.

Respectfully submitted,

/s James Darrow

James Darrow
Assistant Federal Defender
Federal Defenders of New York, Inc.
Tel. (718) 407-7419
james_darrow@fd.org

*Attorneys for Osei Montrose*

cc:  Counsel of record (by ECF and email)
     U.S. Probation Officer Shayna Bryant (by email)
     U.S Pretrial Services Officer Amina Adossa-Ali (by email)